EDISON ELECTRIC
INSTITUTE, Petitioner,

v.

OCCUPATIONAL SAFETY AND
HEALTH ADMINISTRATION,
Respondent.

No. 86–1486.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 18, 1987.

Decided June 7, 1988.

Stephen C. Yohay, with whom Robert E. Williams, Washington, D.C., was on the brief, for petitioner. Mark E. Baker, Washington, D.C., also entered an appearance for petitioner.

Laura V. Fargas, Atty., Dept. of Labor, with whom Cynthia L. Attwood, Associate Sol., and Sandra Lord, Acting Counsel for Dept. of Labor, Washington, D.C., were on the brief, for respondent. Joseph M. Woodward, Atty., Dept. of Labor, Washington, D.C., also entered an appearance for respondent.

Dale R. Schmidt, Washington, D.C., was on the brief for amicus curiae Nat. Elec. Manufacturers Ass'n. Elihu I. Leifer, Washington, D.C., was on the brief for amicus curiae Intern. Broth. of Elec. Workers, AFL–CIO, urging reversal.

Before EDWARDS and D.H. GINSBURG, Circuit Judges, and McGOWAN,* Senior Circuit Judge.

Opinion for the Court by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

The Edison Electric Institute ("EEI") petitions for review of certain provisions of the revised Electrical Standards for Construction, 29 C.F.R. Part 1926, Subpart K (1987) ("revised Subpart K"), issued by the Occupational Safety and Health Administration ("OSHA" or "the agency") pursuant to the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et seq.* (1982 & Supp. IV 1986) ("the OSH Act" or "the Act"). Subpart K sets forth electrical safe-

---

* Judge McGowan concurred in the result in this case but died before completion of the opinion.

ty requirements designed to protect employees involved in construction work. Following an informal rulemaking, OSHA promulgated revised standards that became effective on October 9, 1986, and are now codified at 29 C.F.R. § 1926.400 *et seq.* (1987). EEI, an association of investor-owned electric utilities, challenges three separate provisions of revised Subpart K as applied to the electric utility industry, namely, 29 C.F.R. § 1926.402(b) (1987), limiting the scope of Subpart K; 29 C.F.R. § 1926.432(a) (1987), requiring laboratory testing of certain equipment, and 29 C.F.R. § 1926.417(b) (1987), governing the locking and tagging of deenergized circuits.[1] For the reasons discussed below, we deny the petition for review.

## I.

The OSH Act was adopted "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). In order to effectuate these policies, the Act authorizes the Secretary of Labor to promulgate "occupational safety and health standards" governing worker exposure to health and safety hazards in the workplace.[2] The Act provides three means for promulgating these standards. First, for the two year period following the effective date of the Act, § 6(a) allowed the Secretary to adopt as an occupational safety and health standard any then-existing "national consensus standard" or "established Federal standard" without following the procedures set forth in the Administrative Procedure Act. 29 U.S.C. § 655(a). Second, § 6(b) of the Act allows the Secre-

tary to promulgate, modify or revoke safety standards after notice and comment rulemaking proceedings. 29 U.S.C. § 655(b). Finally, § 6(c) allows the Secretary to promulgate emergency temporary standards when necessary to protect employees from a "grave danger." 29 U.S.C. § 655(c). This rulemaking authority has been delegated by the Secretary to the Assistant Secretary for Occupational Safety and Health, who heads OSHA.

OSHA has enacted three existing standards governing electrical safety in the workplace. Two of these standards, Subparts K and V of 29 C.F.R. Part 1926, address electrical safety in construction work. The former governs general electrical safety requirements for construction, while the latter addresses the more specialized area of safety in the construction of electric transmission and distribution lines. The third standard, Subpart S of 29 C.F.R. Part 1910, governs electrical safety in general industry workplaces.

This case involves Subpart K, which was adopted in 1971 pursuant to § 6(a) of the OSH Act. Its provisions were drawn from the electrical safety regulations originally issued under § 107 of the Construction Safety Act, 40 U.S.C. § 333 (1982). *See* Safety and Health Regulations for Construction, 36 Fed.Reg. 7340 (1971); Redesignation of Safety and Health Regulations for Construction, 36 Fed.Reg. 25232 (1971). In addition to adopting these pre-existing federal regulations, former Subpart K also incorporated by reference the 1971 National Electrical Code ("the NEC"), a model code promulgated by the National Fire Protection Association ("NFPA").[3] *See* 36

---

1. This court has jurisdiction over EEI's petition by virtue of 29 U.S.C. § 655(f), which provides, in part, that

 [a]ny person who may be adversely affected by a standard issued under [the Act] may at any time prior to the sixtieth day after such standard is promulgated file a petition challenging the validity of such standard with the United States court of appeals for the circuit wherein such person resides or has his principal place of business, for a [sic] judicial review of such standard.

 29 U.S.C. § 655(f). EEI has its principal place of business in Washington, D.C.

2. The term "occupational safety and health standard" is defined as "a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. § 652(8).

3. 29 C.F.R. § 1926.400(a) (1986) provided that: All electrical work, installation, and wire capacities shall be in accordance with the pertinent provisions of the National Electric Code, NFPA 70–1971; ANSI C1–1971 (Rev. of C1–1968), unless otherwise provided by regulations of this part.

Fed.Reg. 7370 (1971); Notice Concerning Applicability of Certain Electrical Standards, 37 Fed.Reg. 3431 (1972). The 1971 NEC was also incorporated by reference and by the direct adoption of certain provisions, into former Subpart S. *See* 36 Fed. Reg. 10466 (1971), 37 Fed.Reg. 3431 (1972).

In 1979, OSHA decided to revise the electrical safety standards for general industry contained in Subpart S. *See* Notice of Proposed Rulemaking, 44 Fed.Reg. 55274 (1979). As part of this revision, OSHA proposed that all the relevant provisions of the NEC be included in the text of the regulations, thereby eliminating the need to incorporate the code by reference. *See id.* at 55276. Following notice and comment, this change was adopted in the final revision, which was published on January 16, 1981, and became effective on April 16, 1981. *See* Final Electrical Standards, 46 Fed.Reg. 4034 (1981).

After the revision of Subpart S, OSHA turned to the revision of Subpart K, the standard at issue in this litigation. On January 2, 1982, a draft of the proposed revision was prepared by OSHA and submitted to the Advisory Committee on Construction Safety and Health ("the Advisory Committee"). After the Advisory Committee discussed this draft at their meeting of March 3, 1982, OSHA reviewed the suggested changes and published a revised proposal and notice of proposed rulemaking. *See* 48 Fed.Reg. 45872 (1983). According to the notice, the proposal was designed to place the relevant NEC requirements directly in the text of the standard, integrate the existing requirements of Subpart K into a new format, and draft the requirements in "performance language" so that "changes in technology could be accommodated, without compromising safety." *Id.* Thirty-six written comments were filed in response to the notice. On April 10, 1984, a hearing was held before an administrative law judge. The final revised Subpart K was published on July 11, 1986, with an effective date of October 9, 1986. 51 Fed.Reg. 25294. This petition followed.[4]

## II.

The petitioner's most significant claim is that the revised standard, for the first time, extends some provisions of Subpart K to electrical installations in utility power generation plants. EEI contends that prior to this revision, these generating plants were completely exempt from regulation under Subpart K by virtue of the "utility exclusion" contained in the NEC and incorporated by reference into the original Subpart K. Because the agency did not adopt the language of that exclusion verbatim in the revised Subpart K, petitioner asserts that it has "created uncertainty and confusion" by applying inappropriate requirements to utility power plants. EEI contends that "[t]he resulting standard would have an enormously adverse impact on the industry and ... will not serve the cause of utility employee safety." Petitioner ar-

---

**4.** On September 29, 1986, EEI moved the court for a stay of the agency's revised standard on the ground that two of the provisions challenged here, 29 C.F.R. § 1926.417(b) (Lockout and Tagging) and 29 C.F.R. § 1926.432(a) (Laboratory Testing), would cause irreparable harm as applied to the utility industry. OSHA's response to this motion, filed on October 3, 1986, attached a letter from the agency to the petitioner that (1) acknowledged that § 1926.432(a) does not apply to power generation installations, and (2) agreed to a stay of the application of § 1926.417 on the condition that the petitioner file for a variance from the standard. On the basis of this letter, the court denied the motion for a stay in an order dated October 8, 1986.

On January 23, 1987, EEI moved for rehearing of its motion for a stay, or alternatively, for a writ of mandamus ordering OSHA to notify state administrators and OSHA field personnel of the positions taken in the agency's October 3, 1986 letter. In response to this motion, the court issued an order on February 11, 1987, requiring OSHA to "inform the court by February 20, 1987 of its timetable for communicating to the appropriate states and field personnel its post-promulgation interpretation of the 'identified for use' and 'lockout and tagging' provisions of the new standard as applied to the electric utilities." Instead, OSHA notified the court of a memorandum to its Regional Administrators and state designees concerning the application of 29 C.F.R. §§ 1926.432(a) and 1926.417(b) to utility power plants. (This memorandum is discussed in more detail *infra* at 622, 623–24.) On the basis of this memorandum, the court denied the petition for rehearing in an order filed March 20, 1987.

gues further that the agency's decision to alter the scope of the utility exclusion was not supported by substantial evidence and that OSHA failed to follow several procedural requirements that are mandatory when an existing safety standard is changed. We conclude that all of these claims must be rejected because the petitioner has failed to demonstrate that the revised standard covers EEI's members any differently than did the original standard.

■ We start with the language of the exclusion from coverage in revised Subpart K since there is no substantial dispute among the parties as to its meaning. The relevant provision is 29 C.F.R. § 1926.402(b) (1987), which provides:

> *Not covered.* Sections 1926.402 through 1926.408 do not cover installations used for the *generation,* transmission, and distribution of electric energy, including related communication, metering, control, and transformation installations. (Emphasis added).

The parties agree that this provision, unlike the NEC exclusion that was incorporated by reference in the original Subpart K, applies to generation facilities operated by non-utilities as well as to those operated by the utilities. This change was made in response to the comments of members of the steel industry who successfully argued that their generating facilities should also be entitled to the benefits of the exclusion. *See* 51 Fed.Reg. 25299 (1986); *see also* Comments of the American Iron & Steel Institute at 3–5, *reprinted in* J.A. at 616, 618–20.

It is also agreed that § 1926.402(b) exempts only those "installations," i.e., electrical conductors and equipment,[5] that are actually used for the "generation, transmission and distribution" of electric energy. Thus, installations used for "utilization" purposes, such as lighting or heating (also known as "premises wiring"), are not included within the scope of the exclusion and are therefore subject to §§ 1926.402 through 1926.408 of revised Subpart K even though they may be located in buildings used for the generation of electric energy. It is the last-mentioned aspect of Subpart K that, petitioner contends, represents a radical change from the past.

According to EEI, "under the prior standard, if a building, i.e., a power plant, were used by a utility for the purpose of generating power, the installations in the building were not covered by any part of the standard . . . , regardless of the purpose of the particular installation involved." The rationale for this complete utility exclusion, petitioner argues, was that the NEC was intended to regulate only *users* of electric energy; *producers* of energy were to be subject to the separate National Electric Safety Code ("the NESC"), a voluntary consensus code developed under the auspices of the American National Standards Institute ("ANSI"). The law of most states makes compliance with the NESC mandatory for electric utilities. Petitioner argues that by making some installations in electric power plants subject to both the NEC and the NESC, OSHA has created piecemeal regulation of those facilities that will confuse affected employees and employers.

In response, OSHA argues that it has always interpreted the utility exclusion in the 1971 NEC to be applicable only to installations actually used for the generation of electricity, and that this interpretation accords with the language of the NEC. Moreover, OSHA disputes the assertion that "the NEC and the NESC together provide a seamless web of regulation, with the NESC addressing all aspects of utility work on a plant-wide basis, and the NEC entirely excluding them." Instead, OSHA argues that the two consensus codes have overlapped in the past and agrees that both codes currently address the utilization installations in power generation stations.

---

5. Although the term "installations" is not defined in Subpart K, the parties agree that it is synonymous with "electrical conductors and equipment." The terms "installations" and "electrical conductors and equipment" are used interchangeably in the 1971 NEC. *See* 1971 NEC Art. 90–2 (NFPA), *reprinted in* J.A. at 59–60.

In order to resolve this dispute, we must turn to the language of the 1971 NEC utility exclusion that was incorporated by reference in original Subpart K. The relevant provision is Art. 90–2(b)(5) of the 1971 NEC, which provides that the following installations are not covered:

Installations under the exclusive control of electric utilities for the purpose of communication, metering or for the *generation*, transmission and distribution of electric energy located in buildings used exclusively by utilities for such purposes or located outdoors on property owned or leased by the utility or on public highways, streets, roads, etc., or outdoors by established rights on private property. (Emphasis added.)

Petitioner would have the court read this provision as if it said: "All installations under the exclusive control of electric utilities located in buildings used exclusively by such utilities for the generation of electric energy." But it is apparent that the provision is phrased in a different fashion. In fact, Art. 90–2(b)(5) purports to exclude only those "installations" that are "for the generation ... of electric energy" *and* that are "located in buildings used exclusively by utilities for such purpose[]." The provision does not purport to exclude *all* installations that are located in buildings used for the generation of electricity.

We therefore find that the interpretation adopted by the agency is supported by the language of the regulation itself. In light of this conclusion, petitioner bears a heavy burden in seeking to persuade the court that the agency's interpretation is erroneous.[6] We find nothing in the record before us that is sufficient to meet that burden.

First, petitioner can point to no enforcement pattern that supports its claim that premises wiring was excluded under the original Subpart K. To the contrary, the agency argues that it began enforcing Subpart K against utilities within months of its adoption and has continued to do so on a regular basis. As evidence of these enforcement decisions, OSHA has attached as an appendix to its brief (1) a 1981 citation for a violation of a NEC provision that, according to OSHA, was issued to a utility's main generating plant;[7] and (2) a memorandum dated April 1, 1980, from OSHA's Director of Federal Compliance and State Programs to a Regional Administrator that states that "the National Electric Code 1971 is applicable to power stations with regard to their premise's [sic] wiring for power and light." *See* Respondent's Appendix at 1, 7.

Petitioner responds that these documents constitute "post-hoc evidence" that is not part of the record and that may not properly be considered by the court. Petitioner also suggests that the citation provides no support for OSHA's position because it does not expressly state that it was issued to a utility power plant and because it cites the employer alternatively under the general duty clause of the Act, 29 U.S.C. § 654(a)(1). As for the April 1, 1980 memorandum, EEI argues that it, viewed along with an earlier memorandum to which it responds, demonstrates that the agency had no consistent position on the meaning of the NEC exclusion.

■ Ordinarily, judicial review of informal agency rule-making is confined to the administrative record; neither party is entitled to supplement that record with litiga-

6. EEI suggests that the deference usually accorded to an agency's interpretation of its own regulations, *see, e.g., United Steelworkers of America v. Marshall,* 647 F.2d 1189, 1228 (D.C. Cir.1980), may be inappropriate when the regulation at issue is adopted from a national consensus standard, citing *Marshall v. Anaconda Co.,* 596 F.2d 370, 374 (9th Cir.1979) and *Bethlehem Steel Corp. v. OSHRC,* 573 F.2d 157, 160 (3d Cir.1978). We need not decide this issue because we find that the Secretary's interpretation is the most logical construction of the NEC utility exclusion. No deference is necessary except that due to the plain meaning of the regula-

tion. In fact, as the agency notes, "it is Edison, not the Secretary, which attempts to read the plain language of the 1971 NEC exclusion to mean something other than what it actually says."

7. The citation was issued for a violation of Subpart S rather than Subpart K. Nonetheless, since the 1971 NEC utility exclusion was incorporated into both standards, a citation issued under the one standard is probative of how the exclusion was interpreted under the other.

**618**

tion affidavits or other evidentiary material that was not before the agency. *See Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 284–86 (D.C.Cir.1981); *Doraiswamy v. Secretary of Labor,* 555 F.2d 832, 839–42 (D.C.Cir.1976). Nonetheless, strict application of this general rule would be unwarranted in this case because the meaning of the 1971 NEC utility exclusion was not directly at issue in the proceedings below. The proposed rule that was published in the Federal Register did not provide any explicit exclusion for generation installations. Instead, such installations were excluded by implication from proposed § 1926.402(a), which provided that "Section 1926.402 through 1926.408 contain installation safety requirements for electrical equipment and installations used to provide electric power and light." *See* 48 Fed. Reg. 45822 (1983). In responding to this proposed rule, EEI and other commentators addressed their remarks to the advisability of retaining the NEC exclusion. The agency responded to these comments in the final rule by including an exclusion modeled on the language of the NEC but altered to ensure that it would apply to generation installations "regardless of who controlled them." 51 Fed.Reg. 25299 (1986). Since the language that was eventually adopted was different from the proposed rule, EEI was unable to argue below that the revised exclusion differed from the 1971 NEC exclusion, and the agency had no

occasion to respond to that argument. Under these circumstances, the agency should not be precluded from defending against EEI's allegation that it has altered the scope of the exclusion, and to that end providing the court with public records that document its prior enforcement history.

In any event, however, the enforcement evidence introduced by the agency, while properly before the court, is unnecessary to our decision. The petitioner bears the burden of demonstrating that the agency has previously interpreted the exclusion in a manner that is inconsistent with its current position. Since it has failed to do this, there is no need for us to consider whether, or to what extent, the judicially noticeable evidence is actually probative of the agency's prior practice.

Instead of producing evidence regarding the agency's enforcement history, EEI supports its interpretation of the NEC exclusion by pointing to the affidavits of two members of the committee that drafted the exclusion.[8] The opinions of these members were elicited during the Subpart S rulemaking in response to OSHA's request for comments on whether "the scope of the standard is clear with respect to its coverage of public utilities." Notice of Informal Public Hearing, 45 Fed.Reg. 10375, 10376 (1980).[9] Two affidavits introduced by EEI, those of Mr. E.A. Brand and of Mr. H.P. Michener, support its interpretation of the NEC utility exclusion.[10] Other testimony, such as

**8.** The individual articles of the NEC are drafted by separate panels. A Correlating Committee oversees the work of these panels and is responsible for approving the complete text of the NEC. *See, e.g.,* 1971 NEC at 70v (NFPA), *reprinted in* J.A. at 58.

**9.** At EEI's request, the entire rulemaking record of the Subpart S revision was included in the record of the Subpart K revision.

**10.** Mr. Michener, the 1971 Chairman of Code Panel No. 1, which was responsible for drafting the utility exclusion, stated that:

The wording of [the utility exclusion] has been prepared by a special Technical Subcommittee for the 1968 edition. That subcommittee, however, has also proposed a note that read: "Nothing contained in part (b) of this section is to be construed to exempt any elec-

trical wiring which is used for building lighting or general power purposes."

The panel did not accept this modifying note for the 1968 edition or in its review of the 1971 edition.

I, therefore, understand that the intent of the Code Committee was to exclude from the scope of the 1971 National Electrical Code all the conductors and equipment on the premises of an electric power generating plant under the exclusive control of an electric utility used exclusively by the utility for such purpose, whether or not the particular conductors or equipment were in the generation-transmission-distribution network. J.A. at 237, 238.

The statements in Mr. Michener's affidavit were confirmed by Mr. Brand, who served as a member of the Correlating Committee for the 1971 Code and was also a member of Code

that of Mr. Richard Lloyd, a member of the 1971 Correlating Committee, is ambiguous at best.[11]

■ We do not find compelling evidence of the scope of the utility exclusion in the statements of two members of the drafting committee rendered almost ten years after the enactment of the 1971 NEC. Both the Supreme Court and this court have repeatedly emphasized that post-enactment statements by legislators or indeed by legislatures are not entitled to great weight in interpreting the meaning of legislation. *See, e.g., CPSC v. GTE Sylvania, Inc.,* 447 U.S. 102, 117–18, 100 S.Ct. 2051, 2060–61, 64 L.Ed.2d 766 (1980); *Democratic Congressional Campaign Committee v. FEC,* 831 F.2d 1131, 1134 (D.C.Cir.1987) (citing cases). A similar approach is appropriate when interpreting a national consensus standard. Petitioner has presented no contemporaneous interpretation of the 1971 code to support its unnatural construction of the utility exclusion. We therefore discern no evidence in the "legislative history" that would require us to overturn the agency's interpretation.

Petitioner also points to a "fine print note" or interpretation adopted during the 1981 revision of the NEC. The fine print note states:

It is the intent of this section that this Code covers all premises' wiring or wiring other than utility owned metering equipment, on the load side of the service point of the buildings, structures, or any other premises not owned or leased by the utility. Also, it is the intent that this Code cover installations in buildings used by the utility for purposes other than listed in (b)(5) above, such as office buildings, warehouses, garages, machine shops, recreational buildings which are not an integral part of a generating plant, substation, or control center.

1981 NEC Art. 90–2 (FPN) (NFPA), *reprinted in* J.A. at 184.

EEI argues that the second sentence of this fine print note, by listing affirmatively the utility facilities covered by the Code, underscores those that are not covered, and therefore supports EEI's position that all installations in buildings that are an "integral part of a generating plant" are not covered by the Code. This interpretation of the note gains some support from the rejection, by the most recent Code Panel 1, of a proposal to delete from the note the words "which are not an integral part of a generating plant, substation or control center." The panel explained the decision to reject this amendment to the note on the following ground: "It is not the intent to cover office buildings, warehouses, etc., that are an integral part of a generating plant, substation, or control center." *See* 1986 NEC Technical Committee Report at 11, *reprinted in* Pet.App. at 9.

■ Assuming that we accept the interpretation of the note advanced by the petitioner, however, we do not find it to be dispositive on the meaning of the exclusion included in the original Subpart K. The note was adopted by the drafters of the NEC fully nine years after OSHA incorporated the 1971 NEC into Subpart K. The same factors that counsel against according substantial weight to the *post hoc* affidavits that EEI introduced into the Subpart S rulemaking also militate against relying on this gloss added in a later draft of the code. We therefore find that the agency's position, that it has not altered the scope of the utility exclusion to include premises wiring for the first time, is reasonable.

■ We consider next EEI's contention that the agency has altered the scope of the standard by excluding generation installations from only the installation safety requirements in §§ 1926.402 through 1926.-

Panel No. 1. J.A. at 235, 236; *see also* J.A. at 132–34 (Affidavit of E.A. Brand dated April 18, 1980).

11. Mr. Lloyd noted his "understanding" that the members of Code Panel 1 had "rather lengthy discussions" on the scope of the utility exclusion and stated that the panel's work was accepted by the Correlating Committee. *See* J.A. at 370–72; *see also* Testimony of Dr. Jerry L. Purswell, Director of OSHA's Safety Standards Programs, J.A. at 332, 343, noting that the NEC covers ("the utilization systems or premises wiring found in buildings used by the electric utilities").

408 rather than from the entire revised standard. According to EEI, the NEC utility exclusion incorporated by reference in the original Subpart K served to exclude utility power plants from the entire standard. This suggestion is plainly misguided. There is no reason to conclude that by incorporating the NEC by reference, the agency intended to extend the NEC's utility exclusion to all of Subpart K, including those parts that were not adopted from the consensus code. Instead, under 29 C.F.R. § 1926.400(b) (1986), these provisions, which were borrowed from pre-existing federal regulations, *see supra* at 614, applied to all "electrical installations used on the jobsite," including those installations owned and operated by utility power plants. Since this is the only other significant change in the coverage of the exclusion identified by the petitioner, we conclude that EEI has failed to demonstrate that revised Subpart K differs from original Subpart K with respect to its coverage of utility power plants.[12]

■ This conclusion resolves most of the legal arguments advanced in this petition. Because the exclusion, as applied to the petitioner's members, remains unchanged by the revision of Subpart K, there is no occasion for this court to determine whether the decision to include the premises wiring of generation facilities within the ambit of Subpart K is supported by "substantial evidence," 29 U.S.C. § 655(f), or is "reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. §§ 651(b)(3); 652(8); *see supra* n. 2. Similarly, the Supreme Court's determination in *Industrial Union Dep't v. American Petroleum Inst.*, 448 U.S. 607, 642, 100 S.Ct. 2844, 2864, 65 L.Ed.2d 1010 (1980), that the Secretary must make a threshold finding that a place of employment is unsafe before promulgating any permanent health and

safety standard under the Act, is inapplicable here because the agency's rewording of an existing regulation leaves the meaning of that regulation unchanged. Nor was there any need for the agency to explain how the new rule "will better effectuate the purposes of [the Act]," since the agency did not adopt a standard that "differs substantially from an existing national consensus standard." *See* 29 U.S.C. § 655(b)(8).

Only two of the legal arguments raised by petitioner with respect to the utility exclusion warrant discussion in this opinion. First, EEI argues that "Subpart K is inexplicably inconsistent with Subpart S and is therefore arbitrary and capricious" because "[i]n Subpart K, OSHA has changed the terms of the exclusion, declined to extend it to the entire standard, and rewritten it so as to include non-utility generation facilities. These are precisely the decisions which OSHA rejected in Subpart S."

■ The revised Subpart S adopted the utility exclusion as it was worded in the NEC. *See* 29 C.F.R. § 1910.302(a)(2)(v)(1987). As we have noted repeatedly above, the effect of that regulation as to utility power plants is identical to the exclusion adopted by the agency in revised Subpart K. Indeed, the Preamble to revised Subpart S explicitly interpreted the exclusion to apply to "the *installations* of electric utilities used for such purposes as the generation, control, transformation, transmission and distribution of electric energy," and noted that "other utility installations not of the type noted above are covered." *See* 46 Fed.Reg. 4038–39 (1981) (emphasis in original). There is therefore no "inexplicable inconsistency" between the coverage of Subparts S and K

---

12. Petitioner also suggests that by limiting the scope of the exclusion only to §§ 1926.402 through 1926.408, OSHA has now applied some requirements taken directly from the NEC to all installations at utility power plants. But the only example cited by the petitioner is § 1926.432(a), which deals with the independent laboratory certification of equipment. As we discuss in more detail in a later section of this opinion, OSHA has acknowledged that it made an error by failing to include § 1926.432(a) in the sections covered by the exclusion and has taken reasonable measures to inform interested parties of this error. *See infra* at 623–24.

as these provisions apply to petitioner's members.

The alternative suggestion that the two standards are inconsistent because one exempts utilities from *all* its provisions while the other does not is also without merit. Revised Subpart S currently contains only design safety standards that are derived from the NEC. *See* 29 C.F.R. § 1910.301; 46 Fed.Reg. 4036–37 (1981). Revised Subpart K, by contrast, contains other provisions, such as safety related work practices, in addition to installation safety requirements drawn from the NEC. *See* 29 C.F.R. § 1926.400. As we noted earlier, these additional requirements have never been covered by the NEC exclusion. *See supra* at 15–16. Petitioner has suggested no reason for believing that the agency erred in leaving this aspect of Subpart K unchanged.

Finally, as for the coverage extended by these subparts to non-utility generating plants, we find no need to determine if it is inconsistent or if any inconsistency would be arbitrary and capricious. EEI has failed to show why this issue is relevant to its claims, and has made no effort to demonstrate that it has standing to challenge the Commission's regulations governing other power generating entities.

■ Second, petitioner argues that the agency failed to afford all interested persons an opportunity to evaluate and comment upon § 1926.402(b) in violation of the notice requirements of § 6(b)(2) and (3) of the Act, 29 U.S.C. § 655(b)(2), (3), because the final rule differed from the proposed rule and from the NEC exclusion.[13] In a similar situation, this court has noted that:

> [t]he agency must "fairly apprise interested persons" of the nature of the rulemaking, *American Iron & Steel Institute v. EPA*, 568 F.2d 284, 293 (3d Cir. 1977), but a final rule may properly differ from a proposed rule—and indeed must so differ—when the record evidence warrants the change. "A contrary rule would lead to the absurdity that in rule-making under the APA the agency can learn from the comments on its proposals only at the peril of starting a new procedural round of commentary." *International Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 632 n. 51 (D.C.Cir. 1973). Where the change between the proposed and final rule is important, the question for the court is whether the final rule is a "logical outgrowth" of the rulemaking proceeding. *South Terminal Co. v. EPA*, 504 F.2d 646, 659 (1st Cir.1974).

*United Steelworkers of America v. Marshall*, 647 F.2d 1189, 1221 (D.C.Cir.1980).

In this case, § 1926.402(b) represents a reasonable attempt to accommodate commentators, such as EEI, who urged the agency to include the NEC exclusion in revised Subpart K, as well as other interested parties who wanted their non-utility generating facilities to come within the exclusion. Although the exact language of § 1926.402(b) was not presented for comment, the proposed rule, and the Preamble to revised Subpart S, *see* 46 Fed.Reg. 4038–39 (1981), gave EEI adequate notice that the agency did not interpret the NEC utility exclusion to apply to utilization installations. And while EEI did not introduce any new evidence on the scope of the NEC exclusion in the Subpart K proceedings, it successfully moved to have the entire Subpart S rulemaking record, which addressed the scope issue at length, included in this record. For these reasons, we find that the petitioner was accorded the notice and comment opportunity to which it was entitled.

---

**13.** 29 U.S.C. § 655(b)(2) provides, in part, that The Secretary shall publish a proposed rule promulgating, modifying, or revoking an occupational safety or health standard in the Federal Register and shall afford interested persons a period of thirty days after publication to submit written data or comments. Subsection (b)(3) of that statute provides, in part, that

On or before the last day of the period provided for the submission of written data or comments under paragraph (2), any interested person may file with the Secretary written objections to the proposed rule, stating the grounds therefor and requesting a public hearing on such objections.

## III.

■ We turn, therefore, to the second provision of revised Subpart K that is challenged by the petitioner, namely, 29 C.F.R. § 1926.432(a), or the "identified for use" regulation. Section 1926.432(a) provides that equipment that may deteriorate when used under certain conditions be "identified for use in such conditions."[14] "Identified for use" means tested and approved for that use by a qualified testing laboratory. *See* 29 C.F.R. § 1926.449. Section 1926.-432(a) was derived from the 1981 NEC, *see* 1981 NEC §§ 110–1, 300–6 (NFPA), but is not included within the portion of revised Subpart K that is subject to the utility exclusion. Therefore, revised Subpart K, on its face, requires that all equipment used for the generation of energy be tested and approved by a laboratory if it is used in any of the adverse conditions described in § 1926.432(a).

Both parties to this suit agree that it would be inappropriate to apply the "identified for use" provision derived from the NEC to utility installations covered by the exclusion. OSHA's failure to include this provision within the terms of the exclusion was, in the words of the agency, a "ministerial error." In an effort to correct this error, the agency has issued a memorandum to its Regional Administrators and state plan officials that unequivocally states that "Section 1926.432(a), requiring that equipment used in certain areas be 'identified for use' in those areas by testing laboratories, is not applicable to power generation installations." *See* Memorandum from Leo Carey, Director of the Directorate of Field Operations, dated February 20,

1987, *reprinted in* Pet.App. at 7. In light of this clarifying memorandum and of the agency's acknowledgement in this court that its failure to include § 1926.432(a) within the scope of the utility exclusion was inadvertent, no additional rulemaking will be required to rectify the error. *Cf. Howard Sober, Inc. v. ICC,* 628 F.2d 36, 41–42 (D.C.Cir.1980) ("Requiring a hearing when this sort of mistake is made would waste the [agency's] limited resources by forcing it to reconsider an action that was already decided but improperly executed."). The petitioner faces no risk that the Secretary or her successor will seek to apply the "identified for use" provision to the generation installations of its members. Agency counsel conceded at oral argument that, in light of the position it has taken in this litigation, the agency would be unable to adopt a contrary interpretation of the "identified for use" provision in the future without formally amending the existing rule.

## IV.

The third provision of revised Subpart K that is challenged by the petitioner is § 1926.417(b), titled "Lockout and tagging of circuits," which requires that equipment or circuits that are deenergized "shall be rendered inoperative."[15] This provision was taken from § 1926.400(g) of the original Subpart K with the only change being a reordering of the paragraphs. Nothing in the wording of this provision (either before or after the revision) demands that all deenergized equipment must be locked in order to be "rendered inoperative" within the meaning of the regulation. Nonetheless, EEI interprets a statement in the

14. 29 C.F.R. § 1926.432(a) provides:
 *Deteriorating Agents*—(1) Unless identified for use in the operating environment, no conductors or equipment shall be located:
 (i) In damp or wet locations;
 (ii) Where exposed to gases, fumes, vapors, liquids, or other agents having a deteriorating effect on the conductors or equipment; or
 (iii) Where exposed to excessive temperatures.
 (2) Control equipment, utilization equipment, and busways approved for use in dry locations only shall be protected against damage from the weather during building construction.

15. 29 C.F.R. § 1926.417 provides, in full, that
 (a) *Controls.* Controls that are to be deactivated during the course of work on energized or deenergized equipment or circuits shall be tagged.
 (b) *Equipment and Circuits.* Equipment or circuits that are deenergized shall be rendered inoperative and shall have tags attached at all points where such equipment or circuits can be energized.
 (c) *Tags.* Tags shall be placed to identify plainly the equipment or circuits being worked on.

Preamble to the revised rule as adopting a new requirement that all switches used to disconnect the flow of electric current must be capable of being locked in the "off" position. According to EEI, locks are neither necessary nor feasible in utility power plants. Instead, these facilities have developed "sophisticated tagging systems" that protect employees from accidental reenergization of deenergized equipment. Requiring these power plants to install locks would, according to EEI, "cost each electric utility millions of dollars."

 OSHA has confirmed that it did not intend to require lockout in all such cases. When the Preamble to the revised standard is read as a whole, this is clearly so. While one section of the Preamble states that § 1926.417 "requires the tagging of controls, the locking and tagging of disconnects, and the identification of equipment whenever equipment or circuits are deenergized for work," the agency makes clear, elsewhere in the same discussion, that it has rejected the suggestion of two commentators that "the section be changed to require positive lockout." 51 Fed.Reg. 25315 (1986).

The clear message of the Preamble was reaffirmed by the agency in correspondence with the petitioner. In an October 3, 1986 letter to petitioner's counsel, the Assistant Secretary of OSHA, John A. Pendergrass, noted that § 1926.417(b) "does not by its terms specify that the means of rendering equipment 'inoperative' must be a lock." *See* Pet.App. at 6. Moreover, Mr. Pendergrass agreed that "there may be unique elements of utility power generation facilities that would make the application of locks or other means of rendering equipment inoperable impracticable." Mr. Pendergrass therefore offered to grant a stay of the application of § 1926.417 to utility power generation installations if

EEI would file a petition for variance from the standard (in accordance with section 6(d) of the Act, 29 U.S.C. § 655(d), and 29 C.F.R. § 1905.11), and an application for an interim order.

 In its brief before this court, the agency has reiterated its position that the substance of the lockout and tagging provision has not been changed and that the existing regulation requires only that deenergized circuits be " 'rendered inoperable' by lockout and/or tagging." Despite these repeated reassurances, EEI insists that it is still "far from clear whether the agency intends to require lockout in utility power plants under revised Subpart K." EEI points to the February 20, 1987 memorandum to regional administrators and state plan officials, *see supra* at n. 4, 20–21, which states that

> OSHA does not construe [29 C.F.R. § 1926.417(b)] to require that all disconnects used for deenergization of equipment or circuits be *locked* in all instances in the electric utility industry. See 51 Fed.Reg. 25315. Specifically, where there are unique elements of power generation installations that would make application of locks or other means of rendering equipment inoperable infeasible, the standard should not be read to require locks provided that an equivalent level of employee safety is achieved by tagging.

Pet.App. at 8 (emphasis in original). The memorandum continues by noting that tagging that conforms with the procedures prescribed in Subpart V, *see* 29 C.F.R. § 1926.957(b) and § 1926.950(d), will be considered adequate.[16]

 According to EEI, this letter requires utilities to demonstrate that lockout is "infeasible" before using tags. The agency denies this claim and asserts that the use of the word "feasible" merely re-

16. EEI seeks to amend the rulemaking record in order to include this memorandum and the October 3, 1986 letter from Assistant Secretary Pendergrass. These non-evidentiary documents were previously filed in conjunction with the stay proceedings and are already part of the record before this court. *See supra* at n. 4. There is therefore no need to amend the agen-

cy's rulemaking record in order to permit this court to consider them. That portion of EEI's motion to amend that seeks to add five affidavits submitted by EEI to the agency in support of its application for an administrative stay is denied. These are evidentiary materials that were not part of the rulemaking record and are not appropriately considered by the court.

fers to EEI's own argument that circuits in utility power plants are not designed to be locked. It is unnecessary for us to resolve this dispute in order to uphold revised Subpart K. Both the language of that provision and the agency's position in this litigation confirm that the meaning of that provision has not been changed and that positive lockout is not always required. There is therefore no occasion for us to determine whether the agency may reasonably interpret its regulation to require a utility to demonstrate that lockout is infeasible before using a tagging system. If OSHA seeks in the future to enforce § 1926.417(b) against a utility based on an untenable interpretation of the regulation, or in a manner that is inconsistent with prior practice, the utility will be entitled to raise these issues as a defense against the citation. Review of this rulemaking is not the appropriate proceeding in which to obtain a declaratory judgment about the meaning of a regulation whose substance was unaffected by the rulemaking under review.

■ EEI also suggests that the agency failed adequately to consult with the Advisory Committee with regard to the lockout and tagging provision. The Act provides that the Secretary may consult with this Committee before promulgating or modifying a safety standard. *See* 29 U.S.C. § 655(b)(1). Consultation with the Committee is made mandatory, however, by the Secretary's own regulations. *See* 29 C.F.R. § 1911.10(a) (1987). These regulations provide that the agency must submit to the Committee any proposal, "together with all pertinent factual information available" and that the Committee must respond with any recommendations within the time period prescribed by the agency. While the recommendations of the Committee are non-binding, this court has held that the agency must make more than a "single and brief rest stop" before the Committee when the final rule is "substantively quite different" from the proposal presented to the Committee. *See National Constructors Ass'n v. Marshal*, 581 F.2d 960, 971 (D.C. Cir.1978).

In this case, the lockout and tagging provision presented to and approved by the Committee was not substantively different from the provision in the final rule. In fact, apart from a reordering of paragraphs, it was identical. Nonetheless, EEI suggests that the agency failed to accord the Committee a meaningful opportunity to comment upon the provision because a member of the agency staff informed the Committee that OSHA intended to alter this provision at some unspecified time in the future. Since OSHA did not substantively change the provision before promulgating the final rule, EEI insists that the agency was obliged to return the provision to the Committee to allow it another opportunity to comment.

We find that the agency fully complied with its duty to consult with the Committee. Having been informed by the agency that the rules governing lockout and tagging might be altered, the Committee made no suggestions with respect to this provision and expressed no interest in withholding its approval pending any future modifications. Nor does the record support any inference that the agency intentionally misled the Committee by suggesting that the provision would be revised in the future in order to sidestep Committee opposition to the proposed regulation. To the contrary, the Preamble to the final rule demonstrates that the agency still anticipates revising the lockout and tagging provision in the future. *See* 51 Fed.Reg. 25315 (1986). EEI's suggestion that the revised standard should be set aside so that the Committee may consult further regarding a provision that was carried forward without substantive change from the original standard, and that has already received the Committee's unqualified approval, is wholly without merit.

## V.

■ The National Electrical Manufacturers Association ("NEMA"), an association of manufacturers of products used in the production and use of electricity, filed a six page amicus brief in this case. NEMA purports to challenge § 1926.403(a) of revised Subpart K, which provides that "[a]ll

electrical conductors and equipment shall be approved."

Section 1926.403(a) is not one of the regulations in revised Subpart K that has been challenged by EEI, however, and it is the only petitioner before the Court. The validity of this regulation is not properly raised in an amicus brief, which per Rule 11(e)(2) of the General Rules of this court, must "focus on points not made or adequately elaborated upon in the principal brief *although relevant to the issues before the court.*" (Emphasis added.) If NEMA wished to challenge this regulation, it should have done so by filing a petition for review properly raising the issue.

## VI.

This petition seeks review of three specific provisions of revised Subpart K: the utility exclusion, 29 C.F.R. § 1926.402(b); the lockout and tagging provision, 29 C.F.R. § 1926.417(b); and the identified for use requirement, 29 C.F.R. § 1926.432(a). Petitioner has failed to demonstrate that the first two provisions differ from the original Subpart K in their coverage of its members. As for the third provision, the agency has acknowledged that it was not intended to apply to the generation installations of petitioner's members and has taken steps to ensure that the provision will not be so construed. Accordingly, we find that the petition for review must be

*Denied.*