**NATIONAL TREASURY EMPLOYEES
UNION, Petitioner,**

v.

**FEDERAL LABOR RELATIONS
AUTHORITY, Respondent.**

No. 87–1165.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 29, 1988.

Decided Sept. 9, 1988.

Order Granting Rehearing En Banc
Nov. 23, 1988.

Cary P. Sklar, with whom Lois G. Williams, Gregory O'Duden, and Michael J. Wolf, Washington, D.C., were on the brief, for petitioner.

William E. Persina, Deputy Sol., Federal Labor Relations Authority, with whom Ruth E. Peters, Solicitor, and Arthur A. Horowitz, Associate Sol., Federal Labor Relations Authority, Washington, D.C., were on the brief, for respondent.

Before MIKVA, RUTH BADER GINSBURG, and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

Dissenting Opinion filed by Circuit Judge SILBERMAN.

MIKVA, Circuit Judge:

In February 1987, the Federal Labor Relations Authority ("the Authority") held that the Internal Revenue Service ("IRS" or "the agency") unlawfully refused to bargain with the petitioner, National Treasury Employees Union ("NTEU" or "the union"), over employee parking arrangements at the IRS' new office outside Houston, Texas. The Authority ordered the IRS to bargain with the union. Petitioner maintains that the Authority erred in failing to require retroactive application of any agreement resulting from the order to bargain. We agree that the Authority should have issued a retroactive bargaining order ("RBO") and reverse and remand to the Authority for redetermination of the remedy.

## I. BACKGROUND

In September 1982, the IRS notified the NTEU of a proposed relocation of employees from two downtown offices to a new suburban location outside Houston known as Briarpark. The union proposed to negotiate a number of matters affected by the relocation, including employee parking. Because the IRS claimed it could not yet furnish information concerning its leasing agreement with the building owner, negotiation on this issue was temporarily deferred. In January 1983, the IRS asked the union to enter an interim agreement to facilitate the agency's arrangement with Allright Auto Parks to manage the parking facilities. Unaware that the IRS had already signed a contract with Allright in November, the NTEU negotiated an interim agreement providing that all but 14 spaces would be available to employees at a monthly charge of $20 per space on a first come-first served basis. When the parties met later that month to resume negotiations, the union put forward different proposals concerning parking charges and the number of spaces reserved to management, but the parties were unable to come to a final agreement.

In subsequent meetings, the IRS refused to negotiate further over parking arrangements. The IRS bargaining team first insisted that General Services Administration regulations precluded the agency from paying for parking, then claimed that it had not been delegated authority by the Regional Commissioner to agree to finance parking, and later asserted that the authority to arrange parking was reserved to the Briarpark building owner. Finally, the IRS argued that it had no duty to bargain because no material change in working conditions had occurred with the relocation.

The NTEU filed an unfair labor practice charge with the Authority alleging that the IRS had refused to bargain in good faith in violation of section 7116(a)(5) of the Federal Labor–Management Relations Statute, 5 U.S.C. §§ 7101–7135 (1982 & Supp. 1988) ("the Statute"). The Authority agreed that the IRS violated its duty to bargain over payment and allocation of employee parking spaces. The Authority ordered the IRS to bargain in good faith over the NTEU's proposals, but denied the union's request that retroactive effect be given to any resulting agreement. The Authority justified its decision to confine the remedy to a prospective bargaining order by reiterating its arguments in *Environmental Protection Agency and American Federation of Government Employees*, 21 F.L.R.A. 786 (1986) ("*EPA & AFGE*"). The Authority stated that the prospective bargaining order was an adequate remedy for the IRS' unlawful refusal to bargain because it allowed the parties to address the effects on unit employees of the change in the parking situation resulting from relocation. The Authority explained that the order preserved the parties' flexibility by allowing them to adopt a variety of terms while leaving them free to agree to retroactive application.

NTEU now petitions this court for reversal of the Authority's denial of its request for a retroactive bargaining order. We note in passing that the correctness of the Authority's determination that the IRS en-

gaged in an unlawful labor practice when it refused to negotiate over employee parking is not before us—the sole issue upon review is whether the Authority, given its finding of an unfair labor practice in this case, abused its discretion by not imposing a retroactive bargaining order.

## II. DISCUSSION

We agree with the NTEU that the Authority abused its discretion by failing to mandate retroactive application of an agreement between the parties concerning parking. We take issue with the Authority's view that a retroactive bargaining order is an extraordinary remedy requiring special justification, and with its specific application of that approach in a case such as this where monetary compensation is practicable. We reiterate, in accordance with recent holdings of this court, that to effect the deterrent and remedial goals of the Statute, the Authority must award the fullest measure of "make whole" relief. Where, as here, the congressional intent that unlawful conduct be deterred and "make whole" relief be provided can be respected only by issuing an RBO, and where such an order would not unduly disrupt federal agency administration, we hold that an RBO is required.

### A.

Several sections of the Statute define the remedial authority and responsibility of the Authority. These provisions grant broad discretion to the Authority to fashion remedies for violations of the Statute. Section 7105(g)(3) provides that the Authority may require an agency to take any remedial action it considers appropriate to carry out the policies of the Statute. Moreover, under section 7118(a)(7), "[i]f the Authority * * * determines * * * that the agency * * * has engaged in or is engaging in an unfair labor practice, then [the Authority] * * * shall issue * * * an order * * * (B) requiring the parties to renegotiate a collective bargaining agreement in accordance with the order of the Authority and requiring that the agreement, as amended, be given retroactive effect; * * * or (D) in-

cluding * * * such other action as will carry out the purpose of this chapter."

Although the principles set forth in *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), require us to defer to an agency's interpretation of the statute it administers when the statute is silent or ambiguous with respect to a specific issue, *see id.* at 843, 104 S.Ct. at 2781, we find in this case that the Authority's construction of the Statute fails to implement the clear intent of Congress. *Cf. Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (although "the Authority is entitled to considerable deference when it exercises its 'special function of applying the general provisions of the [Statute] to the complexities' of federal labor relations, * * * reviewing courts * * * must not 'rubber-stamp administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'") (citations and internal ellipsis omitted).

This court has recently stressed that both the remedial responsibility of the Authority and the underlying purpose of the Statute must be understood in light of Congress' intention that "the FLRA's role in adjudicating unfair labor practice cases in the federal sector [should] be similar to that of the NLRB's in the private sector." *AFGE v. FLRA*, 785 F.2d 333, 336 (D.C.Cir. 1986) (per curiam). Thus, in cases where an agency unlawfully effects a unilateral change in working conditions, the Authority, like the NLRB, should restore the *status quo ante* whenever possible, consistent with respect for management's prerogatives under section 7106(a) and the overall goal of agency efficiency. *See AFGE, SSA Council 220 v. FLRA*, 840 F.2d 925 (D.C.Cir.1988). If complete *status quo ante* ("SQA") relief is inappropriate or infeasible, individual "make whole" relief should nevertheless be granted to the extent consistent with the limiting principles already noted. *Id.* at 929–30 (noting a "weighty preference" for individualized "make whole" relief). The award of "make

whole" relief to remedy unlawful agency action is especially appropriate in the case where the relief takes the form of a monetary award. *See AFGE v. FLRA*, 785 F.2d at 337 (citing *Great Chinese American Sewing Company v. NLRB*, 578 F.2d 251 (9th Cir.1978) (noting that monetary relief, such as back pay, is typically granted even when other SQA relief is denied because of undue hardship)). Back pay is one form of such "make whole" relief, but the principle properly applies to any monetary award that compensates employees for losses resulting from unilateral change. As this court has recognized, "such individualized relief is unlikely to be as disruptive as a sweeping institutional remedy." *SSA Council 220*, 840 F.2d at 930. Thus, a remedial determination that withholds monetary compensation for deprivations suffered by employees as a result of unlawful employer action is rarely justified, because "rarely will there be a sound statutory reason to withhold such recompense." *Id.*

▮ An approach to remedies that systematically fails to deter noncompliance, or dilatory compliance, with the Statute's directives is fundamentally at odds with the Authority's responsibilities. As our court pointed out in *AFGE v. FLRA*, Congress expected the Authority to vindicate the public policy of the Statute, expressed in the "Findings and purpose" provision, to encourage collective bargaining in the civil service. *See* 785 F.2d at 338 (citing 5 U.S. C. § 7101(a)). The *AFGE v. FLRA* panel recognized that the Authority's habitual use of prospective bargaining orders to remedy refusal-to-bargain violations provides management no incentive to honor its obligations under the Statute. By refusing to bargain, management wins a delay in compliance with its statutory duty at the risk of no more than a "slap on the wrist." *Id.* Employees are left to bear the losses and suffer the detriments of working under conditions ordained by management rather than fixed by bargaining. Thus, retroactive remedies are an indispensable means to vindicate the Statute's central goals.

B.

▮ The Authority argues that any preference for SQA or "make whole" relief does not extend to orders for retroactive application of bargaining agreements. The Authority maintains that an RBO is not in the same category as an SQA remedy, and does not merit the same favoritism, because an RBO does not restore employees to the state they enjoyed before management unlawfully effected a unilateral change. In the case *sub judice*, a true SQA remedy would consist of undoing the Briarpark relocation, which all parties agree is not feasible. The Authority implies that, although an RBO may return to employees those benefits they would have enjoyed had the agency initially bargained, one cannot assume that the RBO will have this effect; it is sheer speculation that the terms incorporated in the final contract will be those the parties would have adopted initially.

Thus, the Authority does not believe that a policy favoring "make whole" relief should translate into a preference for RBOs. We disagree. A "make whole" remedy compensates individual employees for losses suffered and divests management of the benefits of illegal action. A retroactive bargaining order aims to do the same. The difference is that an RBO requires the Authority, or a grievance committee, to estimate the "make whole" compensation due employees by means of the convenient, albeit somewhat speculative, conceit of assuming that the agreement the parties eventually negotiate approximates the agreement they would have forged in the first instance. The retroactive application of a contract ultimately negotiated by the parties relieves the Authority of the need to speculate on the precise details of a hypothetical contract. *Cf. NTEU v. FLRA*, 732 F.2d 703, 706–07 (9th Cir.1984) (affirming Authority decision declining to apply retroactive relief of its own design).

▮ Recourse to this remedial device is necessary in this case because of the nature of the agency's infraction. This is not a case where the agency effected an isolated change in a working condition it was not

entitled to change without negotiation. Rather, the IRS exercised its lawful right under section 7106(a) to relocate its operations, but failed to bargain over one aspect of the move—new parking arrangements. The entire relocation cannot be reversed without causing undue disruption of agency operations and trenching on the agency's statutory authority. By ordering an RBO, the Authority can avoid these consequences while compensating employees for the difference between what they received under the unbargained-for parking arrangement and what they would have received had the arrangement been subject to bargaining.

The key distinction is not between SQA remedies and RBOs as such, but between remedies that completely undo the institutional arrangements created by the unbargained-for actions of the agency and less intrusive "make whole" remedies. What in the case at bar is called an RBO, and what was called in *SSA Council 220* an SQA (albeit a limited SQA), accomplish the same thing in the same way: both avoid institutional disruption while providing monetary "make whole" compensation to employees adversely affected by a refusal to bargain over a change in working conditions. The compensation is measured and achieved by the retroactive application of the bargaining order. Indeed, the Authority has adopted this convention in computing back pay awards under the Back Pay Act, 5 U.S.C. § 5596 (1982). *See FAA, Washington, D.C. and Professional Airways Systems Specialists, MEBA, AFL–CIO*, 27 F.L.R.A. 230, 234 (1987) (issuing "an order directing bargaining and the payment of backpay consistent with the outcome of the bargaining"). In *SSA Council 220*, 840 F.2d at 930–31, this court suggested that the Authority compute in the same way the compensation due employees adversely affected by an unlawfully implemented evaluation system.

Here, the "make whole" remedy for refusal to bargain over parking charges is straightforward. If the union succeeds in negotiating a lower parking charge than employees currently pay, the employees will receive the difference in the amount paid for parking during the period of unilateral action and the amount set by contract. The measure of retroactive compensation for the IRS' refusal to bargain over reservation of parking spaces for management is less clear. We leave to the Authority's determination the factual question of whether it would be possible for the union to show that employees suffered monetary loss—e.g., in the form of higher parking charges—as a result of removal of some parking spaces from the general pool in the event that those spaces are restored by a negotiated agreement. In any event, a grievance committee need not award, and cannot calculate, this component of a "make whole" award unless the union can demonstrate some "causal nexus" between higher employee charges and the reservation policy. However, the possibility that retroactive compensation for refusal to bargain over this matter may prove infeasible does not undermine the Authority's duty to award retroactive compensation where its measure is clear; nor does it vitiate the requirement that partial "make whole" relief be awarded to the fullest extent possible. *See SSA Council 220*, 840 F.2d at 929–30.

### C.

■ The foregoing discussion demonstrates that retroactive bargaining orders compensate aggrieved employees and encourage management compliance in a way similar to "true" SQA remedies. The Authority nevertheless offers further reasons why an RBO should issue far less frequently than an SQA order that simply requires management to return to prior conditions. The Authority contends that retroactive bargaining orders run afoul of countervailing statutory policies by interfering with the functioning of the Federal Services Impasses Panel ("FSIP" or "the Panel") and infringing the parties' prerogative to determine the content of the collective bargaining agreement in accordance with section 7103(a)(12) of the Statute. The latter provision states that the obligation to bargain collectively "does not compel either party to agree to a proposal or to make a conces-

sion." The Authority claims these considerations justify its practice, as explained in *EPA & AFGE*, not to grant retroactive remedies for simple refusal to bargain but to reserve the remedy for those cases where the agency refuses to negotiate over proposals previously found negotiable or defies a decision by an arbitrator.

The Statute states that the FSIP may "take whatever action is necessary and not inconsistent with this chapter to resolve [an] impasse." 5 U.S.C. § 7119(c)(5)(B)(iii). The Authority contends that the FSIP cannot fulfill its statutory obligation without the flexibility to order any action it deems appropriate to resolve an impasse. We disagree that an order by the Authority to give retroactive effect to the terms of a bargaining agreement significantly impairs the function of the FSIP. Because public employees, unlike their private sector counterparts, do not enjoy the right to strike, Congress created the FSIP to help resolve disputes in the event the parties are unable to agree. The considerations bearing on the proper role of the FSIP are eminently pragmatic; neither the spirit nor the letter of the statutory provisions governing the Panel grants it absolute discretion over every aspect of the collective bargaining process. The Panel retains ample flexibility to arrive at a fair and satisfactory resolution of a bargaining impasse and is free to adjust the substantive content of contract terms against the understanding that retroactive compensation will be part of the bargain. The requirement that any terms stipulated by the Panel be given retroactive effect has a minimal impact on the Panel's functioning and is fully justified by the twin goals of deterrence and employee compensation.

It may be argued that this arrangement is a zero sum game for employees: the agency will simply offer less, knowing it is bound to a retroactive extension of the terms to which it agrees. It is possible that employees will sometimes be forced to give up at the bargaining table, or ordered to relinquish by the Panel, the equivalent of what they have gained by retroactivity, but we doubt that this is inevitable in every case. Bargaining rarely proceeds on a per-

fect economic model of costless transaction, and we think it likely that the union will retain some of the advantage conferred by the privilege to retain or waive its right to retroactive application of bargaining terms. In any event, we decline to base our decision on the possibility that, in some cases, employees may fail to reap the full benefits of a retroactive award.

### D.

 Finally, the agency contends that an RBO will impose bargaining terms on the parties in derogation of section 7103(a)(12). The Authority takes the position that the proper balance between its remedial responsibilities and the parties' prerogative requires the Authority to refrain from ordering retroactivity in all but extraordinary cases. We disagree that Congress intended that the balance be struck to the detriment of the Statute's remedial goals. In section 7118(a)(7)(B), Congress specifically provided that, when necessary to remedy an unfair labor practice, the Authority *"shall* issue * * * an order requiring the parties to renegotiate a collective bargaining agreement in accordance with the order of the Authority and requiring that the agreement * * * be given retroactive effect"* (emphasis added). We think that this "mandatory" language, *see SSA Council 220,* 840 F.2d at 929 (construing section 7118(a)(7)), specifically requires the Authority to grant the relief requested here—namely, retroactive application of terms arrived at by negotiation. In this case, because the Authority has already determined that the IRS committed an unfair labor practice, the mandatory prescription of section 7118(a)(7) governs.

In addition, the legislative history shows that Congress contemplated that retroactivity would be routinely ordered as a remedy for straightforward refusal to bargain. The only enlightening piece of legislative history concerning this provision was furnished on the day following the passage of the Statute by Representative Ford, one of the House conferees on the bill. Representative Ford explained that his comments were intended to supplement the "less than

helpful" conference documents that accompanied a bill passed during the end-of-session rush. *See* 124 Cong.Rec. 38,713 (1978). The Supreme Court has cautioned us not to place great reliance on post-enactment pronouncements. *See, e.g., Regional Rail Reorganization Act Cases*, 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974). Our own precedent repeats that message. *See, e.g., Edison Electric Institute v. OSHA*, 849 F.2d 611, 619 (D.C.Cir. 1988). However, Mr. Ford's comments are consistent with statutory language and were offered to compensate for an otherwise sparse legislative history; we believe his remarks therefore merit some attention. *See NFFE v. FLRA*, 652 F.2d 191, 193 (D.C.Cir.1981); *NTEU v. FLRA*, 774 F.2d 1181, 1187 n. 10 (D.C.Cir.1985).

Mr. Ford stated that section 7118(a)(7)(B) was inserted to give the Authority the power denied the NLRB to issue remedial orders dictating terms of a collective bargaining agreement. *Cf. H.K. Porter Co. v. NLRB*, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed. 2d 146 (1970) (interpreting the National Labor Relations Act to preclude a Labor Board order that a union "check-off" term be included in a negotiated contract). He explained that "the Authority is fully empowered under section 7118(a)(7)(B) to issue an order requiring the violator to agree to [a] provision unless the charging party waives, in whole or part, agreement on the provisions during negotiations. * * * The conference report took this position despite the presence in both title VII and the National Labor Relations Act of the statement that the bargaining obligation 'does not compel either party to agree to a proposal or require the making of a concession.' " 124 Cong.Rec. at 38,714.

This statement, consistent with the statutory language, makes clear that the Authority's section 7118(a)(7)(B) remedial power to order retroactivity, when its exercise is necessary to carry out the purposes of the Statute, takes precedence over the parties' section 7103(a)(12) freedom to bargain without interference. Moreover, the legislative history nowhere limits application of section 7118(a)(7)(B) to cases of egregious and contumacious violation of an order of the Authority or the Panel. Indeed, Representative Ford stated that the provision empowers the Authority to give retroactive effect in those cases "[w]here failure to bargain in good faith has prevented agreement on a provision." He added that "[t]he *mandatory* language used in section 7118(a)(7) reflects the intention of the conferees that where a violation has been found, the Authority *must* issue a remedy appropriate to the violation." *Id.* (emphasis added).

Congress thus intended in section 7118(a)(7)(B) to allow the Authority to issue an order the National Labor Relations Board cannot issue under *H.K. Porter*—namely, an order stipulating the content of a collective bargaining agreement. There is no reason to interpret section 7118(a)(7)(B) as only conferring authority to make retroactive those terms the Authority has *ordered* the parties to adopt. If this provision allows the Authority to stipulate the content of terms and give those terms retroactive effect, then it certainly allows the Authority to take the less intrusive step of ordering that terms negotiated by the parties be applied retroactively. Thus, we understand the language of section 7118(a)(7)(B) to empower the Authority to order the parties to reach their own agreement and require that whatever agreement they reach apply retroactively. Moreover, the statement in the House Report that "[t]he action ordered [by the remedial provision now designated § 7118(a)(7) ] may include: * * * directing retroactive amendment of a collective bargaining agreement" clearly encompasses the case where the Authority requires that the parties' terms be applied retroactively. *See* H.R.Rep. No. 1403, 95th Congress, 2d Sess. 53 (1978), U.S.Code Cong. & Admin. News 1978, p. 2723. Because Congress expressly authorized retroactive orders despite their modest effect on bargaining flexibility, we must reject the Authority's contention that an RBO impermissibly usurps the statutory role of the negotiating parties.

Finally, we note that Representative Ford also stated that Congress expected

"the courts [to] oversee the work of the Authority in this area * * * in order to ensure that the Authority vigorously enforces the purpose and provisions of title VII [the remedial section of the Statute] by adopting remedies sufficiently strong and suitable to make real the promise of the title and the obligations of its provisions." 124 Cong.Rec. at 38,713. This merely confirms our view, based on the statutory language, that we may require the Authority to issue an RBO in this case. Accordingly, we do not accept the dissent's assertion that we have misappropriated a policy choice delegated to the Authority.

### III. CONCLUSION

As the statutory language indicates, and as the Statute's drafters intended, the Authority's remedial mission must take precedence where complete deference to the parties' freedom to bargain or to the FSIP's flexibility to resolve impasses would undermine the Statute's goals. As this court has previously held, the goals of management deterrence and employee recompense are ill served, and the delicate balance of power between management and labor intolerably skewed, by treating the agency as if no violation had occurred. *See AFGE, SSA Council 220 v. FLRA,* 840 F.2d 925 (D.C. Cir.1988); *AFGE v. FLRA,* 785 F.2d 333 (D.C.Cir.1986) (per curiam). For these reasons, we think the Statute requires a retroactive bargaining order in this case. We therefore vacate the order of the Authority and remand for a redetermination not inconsistent with this opinion.

*It is so ordered.*

1. The statute provides:
 Section 7105.

 (g) ... the Authority *may*—

 (3) ... require an agency or a labor organization to cease and desist from violations of this chapter and require *it* to take any remedial action it considers appropriate to carry out the policies of this chapter.

 Section 7118.

 (a)(7) If the Authority ... determines ... that the agency or labor organization named ... has engaged ... in an unfair labor practice, [it] ... shall issue ... an order—

SILBERMAN, Circuit Judge, dissenting:

The majority has unfortunately misappropriated a policy choice that Congress delegated to the FLRA. The "taking" is so palpable that if private property rather than regulatory authority were at stake, just compensation would be owed. As the Supreme Court long ago observed with respect to judicial review of agency-ordered remedies: "Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy." *Phelps Dodge Corp. v. Labor Board,* 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941).

So, recognizing this danger, we have said: "Under the statute,[1] the FLRA has broad discretion (as does the National Labor Relations Board ... under the National Labor Relations Act ...) in framing appropriate remedies for unfair labor practices[.]" *AFGE v. FLRA,* 785 F.2d 333, 336 (D.C.Cir.1986) (footnote omitted). "Accordingly, our review of the FLRA's remedial determination is highly deferential, and we will uphold a remedial order of the FLRA 'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.'" *AFGE SSA Council 220 v. FLRA,* 840 F.2d 925, 928 (D.C.Cir.1988) (quoting *Professional Air Traffic Controllers Org. v. FLRA,* 685 F.2d 547, 585 (D.C.Cir.1982)). Notwithstanding this prior recognition that the re-

 (A) to cease and desist from any such unfair labor practice in which the agency or labor organization is engaged;
 (B) requiring the parties to renegotiate a collective bargaining agreement in accordance with the order of the Authority and requiring that the agreement, as amended, be given retroactive effect;
 (C) requiring reinstatement of an employee with backpay in accordance with section 5596 of this title; and
 (D) including any combination of the actions described in subparagraphs (A) through (C) of this paragraph or such other action as will carry out the purpose of this chapter.
5 U.S.C. §§ 7105(g)(3) & 7118(a)(7) (1982) (emphasis added).

medial choice is, by the very language of the statute, delegated to the Authority and that our review of its choice is carefully circumscribed, the majority now in effect announces a new policy: that the Authority must routinely issue "retroactive bargaining orders" (meaning any agreement that flows from an order to bargain must apply retroactively to the date of violation insofar as it involves added monetary compensation to employees), declaring it an "abuse of discretion" for the Authority to do otherwise. Since, if such an order is required here, it is hard to imagine a case in which it would not be called for, the majority has by judicial decision effectuated a major and far reaching amendment to the FLRA.

This case arises out of the relocation and consolidation of two groups of employees at separate sites to a single new location. The employees' union and representatives of the IRS bargained about various issues regarding this move, and reached agreement on all but two proposals, which related to payment for parking costs and reserved parking spaces for bargaining unit employees. The IRS contended that payment for employee parking was nonnegotiable because otherwise it would be obligated to reimburse employees for increased commuting costs. This is a close case; it is not at all clear how much legal authority the IRS enjoys to agree to subsidize employee parking. Under the Travel Expense Act, 5 U.S.C. §§ 5701 *et seq.* (1982), and the Federal Travel Regulations, 41 C.F.R. Part 101–7 (1987), as interpreted by the Comptroller General, federal employees must bear as personal commuting expenses all costs of transportation *including parking fees. See NTEU v. Family Support Admin., Dep't of Health and Human Servs.,* 30 F.L.R.A. 677, 678 (1987). In 1982 the Authority had held *nonnegotiable* a union proposal that:

> All employees transferred will be guaranteed that they will suffer no financial loss due to increased commuting transportation cost i.e., *higher parking fees,* longer commutes, removal of ability to

ride public transportation or participate in car/vanpools.

*AFGE v. General Servs. Admin.,* 9 F.L.R.A. 825, 827 (1982) (emphasis added). The FLRA believed this proposal inconsistent with federal law (and thereby nonnegotiable, *see* 5 U.S.C. § 7117(a)(1),) because 5 U.S.C. § 5704 provides travel reimbursement *only* if a federal employee is "engaged in official business for the Government"; costs of travel between residence and official duty stations "must be borne by employees." 9 F.L.R.A. at 827. The IRS relied, *inter alia,* on this case when it refused to bargain with petitioner over its proposal. The FLRA, however, distinguished *General Services Administration* because the proposal here involved parking rather than commuting (ignoring inexplicably that the proposal in *General Services Administration* also referred to financial loss attributed to higher parking fees) and because of an IRS regulation which allows the Regional Commissioner to provide parking for employee use when "necessary to the operational effectiveness of the service." [2] Subsequent to its decision in this case, the FLRA has ruled, also in the context of a dispute concerning a relocation, that a proposal requiring an agency to reimburse employees for their parking expenses "to the extent that they exceed parking costs [at the prior location]" is nonnegotiable. *See NTEU v. Family Support Admin., Dep't of Health and Human Servs.,* 30 F.L.R.A. 677, 679 (1987). These FLRA decisions, at the very least, indicate that the IRS' nonnegotiability argument was quite strong. Yet the majority insists on imposing a penalty for refusing to bargain over a subject that even the FLRA has, in other cases, held to be nonnegotiable.

In response to the IRS' additional contention that the proposal interfered with the agency's right to determine its own budget —which would also render the proposal nonnegotiable, *see* 5 U.S.C. § 7106(a)(1)—the Authority observed that

---

**2.** As examples of what makes the provision of parking "necessary to the operational effectiveness of the service," the regulation refers to parking requirements for executive personnel and for people who work unusual hours. This strongly suggests that parking is not to be provided as a routine matter pursuant to this regulation.

GSA had already leased 650 parking spaces at the new facility, some (the number unknown) of which were designated for bargaining unit employees. Thus, according to the Authority, the union's proposal could be seen as directed towards the distribution of those spaces. The union's proposal, furthermore, contained several options (and stated that the agency would provide rental spaces to employees only to the extent it had *legal* authority to do so). It was therefore unclear whether the proposal demonstrably would require additional costs. *See AFGE & Air Force Logistics Command, Wright–Patterson Air Force Base*, 2 F.L.R.A. 604, 608 (1980), *enforced as to other matters sub nom. Department of Defense v. FLRA*, 659 F.2d 1140 (D.C.Cir.1981), *cert. denied sub nom. AFGE v. FLRA*, 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982).

In short, it was not obvious prior to the Authority's opinion that the petitioner's proposal was negotiable, nor for that matter, is it particularly clear after the opinion as the parties go forward to negotiate, precisely what are the boundaries of those negotiations. And certainly it is not evident, as the Authority itself notes, that any specific employee will receive what the majority assumes—"monetary compensation."

This is not a case—and this point is crucial—where the employer unilaterally took away benefits that *it* was supplying the employees. The IRS employees transferred to the new location in Houston came from two different facilities. Those who had worked in the Federal Building had "extensive bus service and a variety of daily, weekly, and monthly parking facilities available in the area," Opinion of Administrative Law Judge at 13, *reprinted in* Joint Appendix at 24 (presumably at their own expense), and those who had worked at the Westpark office found free parking (presumably on the street), but in neither situation had the government supplied parking of any kind. It is therefore hard for me to imagine a less appropriate case for retroactive relief—whatever it is called. Indeed, I dare say that if the Authority had

fashioned exactly the remedy upon which the majority insists, it would have faced a powerful challenge by the IRS for acting in an arbitrary and capricious fashion.

The majority contends that an order requiring that a future agreement to be reached by the parties have retroactive effect (a retroactive bargaining order or RBO) is called for both by our prior cases and the statute's purpose. But we have never held that an RBO is an appropriate, let alone, routine remedy that the FLRA must apply. In *AFGE v. FLRA*, 785 F.2d 333 (D.C.Cir.1986), we considered whether an order obliging the agency to restore the *status quo ante* after a unilateral change was required. There, the EEOC had unilaterally imposed a promotion freeze and refused to bargain with its union over its action. The union, as petitioner in this court, argued that the Authority was obliged to order that employees be placed in the position they would have enjoyed, but for the agency's action—to receive the promotions to which they were entitled absent the freeze. Although we affirmed the Authority, we warned that in the future, budgetary restraints would not suffice to excuse the Authority's refusal to require the *status quo ante*. *Id.* at 337–38. The *status quo*, the base line prior to the agency's action, could, in that earlier case, be determined without regard to future bargaining. Similarly, if, in the present case, the IRS had previously provided parking or compensation for parking and then revoked those benefits, that would be analogous to *AFGE v. FLRA* and an order restoring employees to their prior position would be consistent with the views we expressed. The majority's opinion is not.

Nor in *AFGE SSA Council 220 v. FLRA* did we do more than require that the Authority on remand consider whether individual employees adversely affected by an agency's unilateral introduction of employee evaluation plans be granted monetary *status quo ante* relief to make them whole. We directed the agency's attention to "losses actually suffered by employees," 840 F.2d at 930,[3] because of the new evaluation

---

**3.** Granted, we suggested the possibility that the FLRA might measure those "losses" in terms of a retroactive application of new collectively bar-

gained procedures but we did not require that. 840 F.2d at 931.

plans. In no comparable sense can it be said that the majority's opinion requires that the IRS employees be compensated for "actual losses," because the IRS has not taken away from the employees anything that it has previously provided.

The Ninth Circuit, moreover, has considered this question, and rejected the majority's approach. *NTEU v. FLRA*, 732 F.2d 703 (9th Cir.1984). In that case, the United States Customs Service established three new shifts at Honolulu International Airport, but refused to negotiate with the employees' union regarding starting and quitting times and lunch hours for the new tours of duty. *Id.* at 704. The FLRA determined that this refusal was an unfair labor practice, but refused to adopt the administrative law judge's order that the Customs Service be required to make employees whole for loss suffered due to the failure to bargain by means of what was in effect an RBO.[4] *Id.* Rebuffing the union's challenge to the FLRA's actions, the Ninth Circuit accepted the Authority's rationale that where there is no preexisting baseline that the Authority may order reinstated, or that may be used against which to measure damages, a *"status quo ante"* remedy was not required to effectuate the statute, and would furthermore be speculative. *Id.* at 706. The court dismissed the argument the majority embraces, that a retroactive order was necessary to effectuate the purposes of the statute, and instead correctly applied the basic proposition of administrative law: "If an agency's construction of the statute that it is primarily responsible for implementing is reasonably defensible, we may not reject that construction simply because we prefer another view."

The majority's reliance on the statute's purpose is, in my judgment, even more tenuous than its case support. It is argued that Congress intended that the FLRA's role be similar to that of the NLRB. That is generally correct and we have often said

it. *See, e.g., Turgeon v. FLRA*, 677 F.2d 937, 939–40 (D.C.Cir.1982). But it also follows that Congress intended the relationship between the courts of appeals and the Authority to track that between the courts of appeals and the NLRB—and that implication the majority ignores.

In fact, the NLRB has *never* fashioned a remedy akin to the one the majority insists upon. *See Yorke v. NLRB*, 709 F.2d 1138, 1145–46 (7th Cir.1983), *cert. denied*, 465 U.S. 1023, 104 S.Ct. 1276, 79 L.Ed.2d 680 (1984). This court and the NLRB, in a jurisprudential *pas de deux* in the 1970s, *see Tiidee Products, Inc.*, 174 N.L.R.B. 705 (1969); *International Union of Elec., Radio and Machine Workers v. NLRB*, 426 F.2d 1243 (D.C.Cir.), *cert. denied*, 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970); *Ex–Cell–O Corporation*, 185 N.L.R.B. 107 (1970), *enforced as modified sub nom., International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. NLRB*, 449 F.2d 1046 (D.C.Cir.1971); *International Union of Elec., Radio and Machine Workers v. NLRB*, 502 F.2d 349 (D.C.Cir.1974), *cert. denied*, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975); *International Union of Elec., Radio and Machine Workers v. NLRB*, 502 F.2d 349, 361 (D.C.Cir.1974) (Bazelon, J.) (statement on denial of rehearing en banc), expressed sharply different views as to the Board's authority to impose remedies approaching that which the majority calls for.[5] Still, recognizing the limitations of judicial review of an agency choice of remedy, we never directed the NLRB to impose a remedy of *our* choice. And the Board, despite repeated requests to consider our view, has declined to adopt it. *See, e.g., J.P. Stevens & Co., Inc. and Textile Workers Union of America*, 205 N.L.R.B. 1032 (1973). Even under our reading of the NLRA, however, we thought the NLRB justified in imposing "make-whole relief" only when an employer violated 8(a)(5) by refusing to bargain for friv-

---

4. The term RBO apparently was not yet in use.

5. Even there, this court did not suggest that the parties be required to make contract terms agreed to in the future retroactive. Rather, the court requested that the Board use its expertise to create a hypothetical contract based upon the

Board's view of what the parties would have agreed to, if the employer had bargained in good faith. This type of remedy—and not the retroactive bargaining order required by the majority opinion—is what § 7118(a)(7)(B) empowers the Authority to impose.

olous grounds. In this case, there is no allegation that the IRS' refusal to bargain was frivolous; to the contrary, as I have shown, the negotiability question raised by the agency is quite substantial. Thus, the FLRA's cease and desist order issued here was adequate even judged according to the most expansive view of what qualifies as a suitable remedy under the National Labor Relations Act.

To be sure, the Federal Labor Relations Act specifically provided that the Authority have power the NLRB lacks to "requir[e] the parties to renegotiate a collective bargaining agreement in accordance with the order of the Authority and requir[e] that the agreement, as amended, be given retroactive effect." 5 U.S.C. § 7118(a)(7)(B). Since Congress granted the Authority power to actually fashion the content of a collective bargaining agreement, it is not surprising that it also authorized the FLRA to issue an order exercising that power retroactively. When the Authority does so, the retroactivity aspect of the order does not appreciably interfere with free collective bargaining any more than the amended contract. But it is by no means clear to me, as it apparently is to the majority, that Congress allowed (much less required) the Authority to order retroactivity of an agreement that it does not fashion, but is yet to be agreed upon by the parties. The latter step, as the majority concedes, necessarily involves an unforseeable impact on the parties' bargaining behavior. Majority Op. at 299. That is why I think the majority incorrect in assuming that ordering retroactivity of an agreement to be freely bargained is "less intrusive," Majority Op. at 300, than making an agreement the Authority itself has fashioned retroactive.[6] It is not really a question of less or more, it is rather of two entirely different concepts.

It is not even apparent that the language of the section upon which the majority relies is susceptible to the majority's interpretation. On its face, it seems that retroactivity may attach only to an Authority or-

der that incorporates the content of the agreement to be imposed. Of course, we would owe deference to the FLRA's interpretation of that language if it agreed with the majority, but we are not here faced with that circumstance because the FLRA determined that an RBO was inappropriate. It turns *Chevron* on its head for a court of appeals to offer *de novo* its interpretation of a statute, entrusted to an administrative agency, and then oblige the agency to accept it.

It will be recalled that the majority does even more than conclude that the statute authorizes the Authority to issue an RBO without at the same time specifying the content of the agreement; it *directs* the FLRA to issue such an order in this case because, according to the majority, the statute requires an RBO to be used routinely.[7] In other words, the majority has stripped the FLRA of discretion to determine when to use this new remedy; it must do so always. Indeed the majority remands to the Authority with directions essentially to enter a retroactive bargaining order, rather than, as is proper, to reconsider in light of the concerns expressed by the court. The effect of this judgment is exactly the same as if the court had itself amended the Authority's order and then enforced that order as amended. The Supreme Court, however, has unanimously reversed this court for issuing just such a judgment, holding that:

> when a reviewing court concludes that an agency invested with broad discretion to fashion remedies has apparently abused that discretion by omitting a remedy justified in the court's view by the factual circumstances, remand to the agency for reconsideration, and not enlargement of the agency order, is ordinarily the reviewing court's proper course.

*NLRB v. Food Store Employees Union Local 347*, 417 U.S. 1, 10, 94 S.Ct. 2074,
we do not have the Authority's view of this question of statutory interpretation.

---

6. The majority assumes that the union could waive retroactivity or bargain it away during negotiations, but that also is by no means clear under § 7118(a)(7)(B), which authorizes retroactivity pursuant to an order of the Authority that sets the *terms* of the agreement. Of course,

7. The majority makes no effort to limit its rationale to the facts of this case.

2080, 40 L.Ed.2d 612 (1974).[8] That the court's judgment here is *technically* a remand is of little significance. As I read the court's opinion, the Authority is not asked to reconsider the majority's view of the appropriateness of an RBO; it is told to apply it with only limited discretion as to the order's contours.

The majority justifies overriding the plain language of the statute, which gives the Authority discretion to choose the remedy *"it* considers appropriate to carry out the policies of this chapter," 5 U.S.C. § 7105(g)(3) (emphasis added), based on a general comment one Congressman made on the day *after* the Act was passed. We have only recently stated, however, that: "It should go without saying that post-enactment legislative history is singularly unavailing in the sensitive process of divining meaning." *Continental Air Lines, Inc. v. Dep't. of Transp.*, 843 F.2d 1444, 1447 n. 3 (D.C.Cir.1988). And, we even previously observed that another passage from the *same speech* by Congressman Ford should be given "little weight." *AFGE v. FLRA*, 712 F.2d 640, 647 & n. 29 (D.C.Cir.1983). Be that as it may, this comment, even had it been made as part of the legislative history instead of in lieu of it, would hardly satisfy the specific intent necessary under *Chevron* to substitute a judicial construction for that of an agency.

Congressman Ford's statement, upon which the majority rests so very much, was only that section 7118(c)(7)(B) was inserted to give the Authority the power that the NLRB lacked—which is quite obvious—and that the mandatory language used in section 7118(a)(7) that the Authority "shall issue an order" (in the event of an unfair labor practice) means they "must issue a remedy appropriate to the violation." That comment does not seem to give any support to the majority's notion that section 7118(a)(7)(B) or any portion of it should be routinely applied. Congressman Ford did not say that it should; he only stated that the agency must choose the appropriate remedy, which adds nothing to the plain meaning of the statutory language.

Certainly the House Committee Report does not support the majority's position. The House version of section 7118 is very close to the statutory language finally adopted by both the Senate and the House, while the Conference Report does not refer to this section at all. As such, the House Report is clearly the most authoritative legislative history regarding this provision. *See American Jewish Congress v. Kreps*, 574 F.2d 624, 629 n. 36 (D.C.Cir.1978); *American Airlines, Inc. v. Civil Aeronautics Bd.*, 365 F.2d 939, 948–49 (D.C.Cir. 1966). It states that:

If the Authority (or its designee) deter-

---

**8.** The Court explained the value of a remand: "Application of that general principle in this case best respects the congressional scheme investing the Board and not the courts with broad powers to fashion remedies that will effectuate national labor policy. It also affords the Board the opportunity, through additional evidence or findings, to reframe its order to better effectuate that policy." 417 U.S. at 10, 94 S.Ct. at 2080 (citation omitted). The majority all but ignores the Court's teaching with regard to the utility and propriety of a remand.

Just a short time ago, this court in *AFGE SSA Council 220 v. FLRA* endorsed the Authority's analytical framework for determining the suitability and extent of retroactive relief for failure to bargain over "impact and implementation" procedures. *See* 840 F.2d 925, 929 (D.C.Cir. 1988). This framework "involve[s] consideration of (1) whether and when notice [of the underlying event] was given to the union; (2) whether and when the union requested bargaining; (3) the willfulness of the agency conduct; (4) the nature and extent of the impact experi-

enced by adversely affected employees; and (5) to what extent a *status quo ante* remedy would disrupt or impair the efficiency and effectiveness of the agency's operations." 840 F.2d at 928 (citing *Federal Correctional Institution and AFGE Local 2052*, 8 F.L.R.A. 604 (1982)). *See also AFGE v. FLRA*, 785 F.2d 333, 337 (D.C.Cir. 1986) (noting that Authority may consider whether agency's position was taken in good faith in fashioning relief). Surely the majority does not now intend to characterize these considerations as irrelevant to a decision to award retroactive relief, yet the majority implicitly broadcasts this very message by declaring its own remedial determination obligatory as a matter of law.

Even if the majority were correct in erecting a statutory presumption favoring RBOs, it should remand for future consideration, much as we did in *AFGE SSA Council 220*. *See* 840 F.2d at 929–31. For were the court actually authorized to restructure the variables in the relief equation, it would remain the Authority's province to determine the answer.

mines that an agency or labor organization named in the complaint has engaged in or is engaging in an unfair labor practice, the Authority or its designee is required to state its findings of fact and to issue and cause an order to be served on the agency or labor organization. The order shall require the party to take such action to carry out the policies of chapter 71. The action ordered may include: ceasing and desisting from the unfair labor practice; directing retroactive amendments of a collective bargaining agreement; requiring an award of reasonable attorney's fees and reasonable costs and expenses of litigation; or requiring reinstatement of employees with backpay and interest.

H.R.REP. No. 1403, 95th Cong., 2d Sess. 53 (1978), U.S.Code Cong. & Admin.News 1978, p. 2723. Thus, although the majority finds the FLRA's action in this case to be contrary to the clear intent of Congress, Majority Op. at 296, there is actually nothing in the *bona fide* (or ersatz) legislative history that supports this view. The Committee Report merely lists a number of possible remedies, including the one imposed by the Authority in this case—an order to cease and desist from an unfair labor practice. The Report does not say that *status quo ante* relief in general, or retroactive bargaining orders in particular, should be imposed as a routine matter. Quite obviously, Congress expected (wrongly, as it now turns out), that the choice of remedy would be left to the sound discretion of the FLRA.

As the majority notes, one member of Congress, Congressman Ford, wanted an entirely new concept of judicial review of agency decision making to apply to *all* FLRA opinions. In the passage partially quoted by the majority, Majority Op. at 301, he did not limit his exhortations to judicial review of the Authority's choice of remedies [9] and later in his remarks he was quite explicit:

"Moreover, in establishing judicial review we expect that the courts will scrutinize the actions of the Authority with less of the deference given other administrative agencies."

124 Cong.Rec. at 38,718 (1978).

Had the Congress accepted Congressman Ford's view, the majority's extraordinarily broad assertion of judicial power would at least be more understandable. But, the Congress did not do so, *see* 5 U.S.C. § 7123(c) (providing for review of FLRA action in accordance with the Administrative Procedure Act, 5 U.S.C. § 706), and no court (including the Supreme Court—*see BATF v. FLRA*, 464 U.S. 89, 97 & n. 7, 104 S.Ct. 439, 444 & n. 7, 78 L.Ed.2d 195 (1983)) has heretofore placed this novel construction on the judicial review provisions of the Act based on Congressman Ford's post-enactment speech.

Which brings me to what in truth is the crux of the majority opinion. My colleagues simply believe that a retroactive bargaining order is *more* appropriate than the one the Authority fashioned, because the Authority's approach creates an insufficient disincentive to a government agency's incorrect refusal to bargain over a union's proposal. The difficulty with judicial policy-making is not only that it is unauthorized, however, it can also be inexpert. I am afraid that is true here. The majority does not consider fully, in the manner we would require an agency under the APA, what effect its "interpretation" of the statute will have on the statute's administration. Congress quite clearly contemplated that negotiability (whether a union's proposal is a proper subject of bargaining) would be a good deal more difficult to determine than is true in the private sector under the NLRA. There are a host of reasons why a government department may legitimately refuse to bargain. For example, the proposal may conflict with governmentwide personnel regulations, *see AFGE Local 2782 v. FLRA*, 803 F.2d 737

---

**9.** A more complete account of Congressman Ford's statement reads as follows:

"[Congress harbored the] expectation that the courts will oversee the work of the Authority in this area (*as well as others*) in order to insure that the Authority vigorously enforces the purpose and provisions of title VII by adopting remedies sufficiently strong and suitable to make real the promise of the title and the obligation of its provisions."

124 Cong.Rec. at 38,714 (1978) (emphasis added).

(D.C.Cir.1986), or it may concern any of a number of rights explicitly reserved to management by statute. *See* 5 U.S.C. § 7106(a).

In order to provide a speedy mechanism to resolve the inevitable disputes that would arise because of this thicket of complexity, Congress provided that a union could directly appeal an agency's determination that a proposal was not negotiable. 5 U.S.C. § 7117(c)(1); *see, e.g., Department of Defense v. FLRA*, 659 F.2d 1140, 1147 (D.C.Cir.1981), *cert. denied*, 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982). At the union's option, however, it could also take the presumably more time-consuming route of charging an unfair labor practice, which requires the General Counsel to issue a complaint (if he agrees with the union).[10] 5 U.S.C. § 7118. Still, Congress obviously wished to encourage resolution of these issues where there was a reasonable difference of opinion (such as, at minimum, exists in our case) through direct negotiability appeals. *See AFGE Local 2736 v. FLRA*, 715 F.2d 627, 629–30 (D.C. Cir.1983). The majority's approach insures instead that a union will virtually always file an unfair labor practice because, in the event it prevails, it will have gained retroactivity—*whatever* that is worth. Under these circumstances, the direct appeal that Congress fashioned to deal with precisely the problem that troubles the majority will be superseded.

\* \* \* \* \* \*

Long before the Supreme Court heightened the deference courts of appeals are obliged to afford administrative agencies' interpretations of their own statutes in the landmark *Chevron* case, it was black letter administrative law that we were to defer to an agency's choice of remedy. In that regard, it seems utterly inconceivable to me that it can fairly be said that the FLRA has selected an order that *"patent[ly]* attempts to achieve ends other than those [that] effectuate the policies of the Act." *AFGE SSA Council 220*, 840 F.2d at 928 (quoting *Professional Air Traffic Controllers Org. v. FLRA*, 685 F.2d at 585) (emphasis added). But, not only does the majority refuse to defer to the agency's choice of remedies, it refuses to defer to the agency's interpretation of its statute and refuses to remand for reconsideration in light of its concerns. As such, the majority opinion is a "triple threat" to settled principles of administrative law. Although we have the raw power, we have not the right to direct the agency to adopt a different remedy in a whole class of cases. Our interference with the Authority's administration of the Act will have incalculable consequences on the behavior of future bargaining, but of one result I am quite certain: this circuit, which is the only one to adopt this novel interpretation of the Act, will, unless the majority opinion is superseded, certainly attract all petitions for review filed by unions seeking a retroactive bargaining order. I respectfully dissent.

Before WALD, Chief Judge; ROBINSON, MIKVA, EDWARDS, RUTH B. GINSBURG, STARR, SILBERMAN, BUCKLEY, WILLIAMS, D.H. GINSBURG and SENTELLE, Circuit Judges.

### ORDER

Respondent's Suggestion for Rehearing *En Banc* has been circulated to the full court. The taking of a vote was requested. Thereafter, a majority of the judges of the court in regular active service voted in favor of the suggestion. Upon consideration of the forgoing, it is

Ordered, by the Court *en banc*, that this case will be considered and decided by the Court sitting *en banc*.

A future order will govern further proceedings.

---

10. Where an agency asserts that a proposal is nonnegotiable because it is inconsistent with a government wide rule or regulation, and the union responds by alleging that "no compelling need" exists for that rule or regulation, § 7117(b) provides the exclusive procedure for resolving that dispute. *FLRA v. Aberdeen Prov-*

*ing Ground, Dep't of Army*, —— U.S. ——, 108 S.Ct. 1261, 99 L.Ed.2d 470 (1988). But where negotiability in general—and not "compelling need"—is in dispute, the statute provides that the union *"may"* appeal in accordance with § 7117(c). 5 U.S.C. § 7117(c)(1) (emphasis added).